AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

        v.

**CRIMINAL COMPLAINT**

LARRY MCDANIEL, a/k/a Larry Mack,
SEAN KING,
HOWARD BROWN

CASE NUMBER: 2: 12-m15-42-SSC

FILED IN CLERK'S OFFICE
U.S.D.C. Gainesville

AUG 15 2012

By: JAMES N. HATTEN, Clerk
                         Deputy Clerk

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about <u>July 18 and 19, 2012</u> in <u>Fulton and White</u> Counties, in the Northern District of Georgia defendant(s) Track Statutory Language of Offense)

aided and abetted by each other and others unknown, did corruptedly endeavor to influence, obstruct and impede the due and proper administration of the law under which a proceeding was pending before the Federal Bureau of Investigation, an agency of the United States, that is, that the defendants influenced, obstructed and impeded, and did attempt to do so, an undercover investigation being conducted by Special Agents of the Federal Bureau of Investigation in which D.S. was acting as a confidential informant and in which D.S. was engaging in undercover tape recorded conversations with targets of the investigation about possible violations of federal law, by advising targets of the investigation and others that the defendants had in their possession information that D.S. was cooperating with the FBI as an informant,

in violation of Title 18, United States Code, Section(s) 1505.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof.        (X) Yes ( ) No

_____
Signature of Complainant
MARK SEWELL

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

<u>August 15, 2012</u>           at    <u>Gainesville, GA</u>
Date                      City and State

SUSAN S. COLE
<u>United States Magistrate Judge</u>        _____
Name and Title of Judicial Officer      Signature of Judicial Officer
AUSA William L. McKinnon, Jr.

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I. Mark Sewell, being duly sworn, hereby state that the following is true and correct to the best of my knowledge and belief:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since 1997. I am assigned to the Gainesville Resident Agency of the Atlanta Division of the FBI. I am assigned full time to the North Georgia Major Offenders Safe Streets Task Force (SSTF). Prior to joining the FBI, I served in the United States Marine Corps for nine years.

2.      I have worked directly with the UCE, CI-1 and CI-2 during the past 24 months of this investigation. UCE is an FBI certified Undercover Employee with 10 years of undercover experience, having attended and completed FBI Undercover School. I believe CI-1 and CI-2 to be reliable and trustworthy, having been FBI Informants in this investigation since the investigation's inception. The information provided by CI-1 and CI-2 in the past has proven accurate and reliable, as CI-1 and CI-2 have made in excess of 50 audio and video undercover tapes against various subjects of this investigation. Neither CI-1 nor CI-2 are currently facing criminal prosecution and are being paid for their cooperation. Furthermore, much of the information supplied by CI-1 and CI-2 in this investigation has been corroborated independently via FBI surveillance, intelligence gathering and by the UCE.

3.      During the past 24 months the FBI has been conducting an undercover investigation utilizing the UCE and CI-1 as undercover operatives. Targets of the investigation have been members of the Outlaw Motorcycle Club (OMC), to include Larry McDaniel, a/k/a Larry Mack, the president of the Georgia Chapter of the OMC, and members of other motorcycle clubs that are affiliated with the OMC. One of the affiliated clubs whose members have been under investigation is the Cleveland, Georgia chapter of the Black Pistons Motorcycle Club (BPMC). CI-1 is the chapter president of the Cleveland Chapter of the BPMC. The Cleveland Chapter of the BPMC maintains a clubhouse for its members' use. As president of the Cleveland Chapter CI-1 manages the clubhouse.

4.      At the outset of the undercover investigation CI-1 introduced the UCE to various motorcycle club members as a friend of his from Florida. The UCE posed as a drug dealer who was intending to expand his drug business into North Georgia. The UCE was able to meet and befriend members of the OMC, the BPMC, and other motorcycle clubs through his alleged friendship and association with CI-1. During the course of the investigation the UCE has recruited motorcycle club members to assist him in narcotics trafficking activities by acting as lookouts for law enforcement agents and rival drug dealers who might attempt to steal the UCE's drugs and/or money during both actual and ruse drug transactions. The CI-1's confidential role as an FBI informant during the investigation is and has been essential to the success of the FBI's undercover investigation into criminal activity on the part of members of the OMC, the BPMC, and other motorcycle clubs in North Georgia. As will be demonstrated below, CI-1's position as a confidential FBI informant has been compromised thereby effectively ending the ability of the

UCE and CI-1 to conduct any further undercover investigation. The defendants charged in this complaint have obstructed the ongoing undercover investigation by revealing to other motorcycle members that CI-1 is an informant.

5.      On July 18, 2012 your affiant received information from a concerned citizen. This information indicated that the OMC was aware that the 'Feds' had placed either a UCE or a CI inside the Black Pistons Motorcycle Club (BPMC), Cleveland, Georgia chapter. Furthermore, the OMC mentioned the suspected UCE or CI by his real name and his BPMC 'club name'. (NOTE: As background, the BPMC is a high-level support club for the OMC. Often, the OMC clubhouses are considered '50/50 houses', as they are shared by members of the OMC and the BPMC. Your affiant's experience indicates that the BPMC is the only support club that is granted the privilege of sharing a clubhouse with the OMC. Also, your affiant's experience has proven that members of the OMC often refer to the FBI or the ATF as 'the Feds'). However, the concerned citizen was not aware of how the OMC had come to the conclusion that the 'Feds' had a UCE or CI inside the BPMC. In reality, your affiant and the FBI *had* placed a UCE and two CIs into the BPMC, as members and associates. Furthermore, the real name mentioned by the concerned citizen matched the real name of CI-1. As a safety precaution, your affiant personally met with CI-1 on July 19, 2012 and advised CI-1 of the potential revelation of his identity as an FBI Informant.

6.      On July 19, 2012 at approximately 9:00 P.M., 1 member of the OMC Sean King and 6 members of the BPMC, including Georgia BPMC President Howard Brown, arrived together at the BPMC Cleveland clubhouse, located at 87 Whitehall Circle in White County, Georgia. This address is located in the Northern District of Georgia. These individuals arrived in 2 vehicles. One vehicle was a black Humvee and CI-1 recognized this vehicle as belonging to King. The other vehicle was a van and CI-1 believes that this van is a 'support van' that belongs to the OMC. These vehicles blocked one of the two driveways that service the BPMC clubhouse. (NOTE: The arrival of these 7 individuals, driving one Humvee and one van was captured on an FBI 'pole-cam'. This video camera, operating 24/7, was utilized by your affiant as an investigative technique to assist in identifying members and associates of the OMC, BPMC and other OMC support clubs. Due to the diminished daylight at their time of arrival, the 'pole-cam' was unable to clearly identify the 7 individuals. CI-1 and CI-2 identified the 7 individuals as:

OMC member Sean King;
Georgia BPMC President Howard Brown;
BPMC member Douglas McDonald;
BPMC member Jeff Sohler;
BPMC member (name unknown);
BPMC member (name unknown);
BPMC member from Florida known as 'Misfit;

According to CI-1 and CI-2, these 7 individuals entered the BPMC Cleveland clubhouse and confronted CI-1 and the other BPMC members and probates. During this confrontation, 5 individuals demanded that CI-1 and the other BPMC members surrender their BPMC 'patches', to include full patches, probate patches and property patches. The other 2 individuals positioned themselves as guards, posting themselves upon the second driveway that services the BPMC

clubhouse.   (NOTE: The 'Patches' that were demanded to be surrendered are the leather vests that motorcycle club members wear, in which the club's unique symbol is sewn onto the back of the vest).   CI-1 noted that of the 7 individuals, 3 were armed with pistols in their waistband and are listed as:

OMC member Sean King;
BPMC member Douglas McDonald;
BPMC member from Florida known as 'Misfit';

During this confrontation, Howard Brown told the BPMC Cleveland members that he was delivering "...word from up high, that he was to close down this clubhouse...".   Brown added that he was not going to listen to any questions or accept any debate from the BPMC members. In fact, when CI-1 asked why the clubhouse was being shut down, Brown sarcastically stated "...oh, here come the questions...".   Brown told CI-1 and all other BPMC members, probates and associates present that he was to collect all 'patches', belts, rings, t-shirts and miscellaneous items that indicated a relationship to either the OMC or the BPMC.   Brown also demanded the clubhouse 'books'.   These books are kept internally by a clubhouse treasurer and detail the monies that the club earns and spends.   Initially, BPMC members refused to surrender their 'patches', specifically BPMC member Walt Verrill.   However, at that point in time OMC member Sean King took Verrill into the clubhouse bathroom and spoke to him privately.   Upon exiting, Verrill surrendered his 'patch', prompting CI-1 to ask what King had just told Verrill inside the bathroom.   At that point, King then took CI-1 into the bathroom and told CI-1 that OMC President Larry McDaniel had sent the 7 individuals to close the BPMC clubhouse because McDaniel said "...there is a 'Fed' in the house and I have a GBI letter that proves it...". At this point, CI-1 and all other BPMC members, probates and associates surrendered all of the requested items.   They surrendered 5 full 'patches' belonging to:

CI-1;
Anthony Walton;
Walt Verrill;
AJ Anderson;
Robert Musser (not present, but the 'patch' was present);

1 probate patch belonging to:
Ed Last Name Unknown
3 property patches belonging to:
CI-2
Dixie Morgan (not present, but the 'patch' was present)
Tracy Walton

(NOTE: Full patches belong to full club members, probate patches often simply say 'PROBATE' and are for individuals attempting to gain full membership and property patches belong to the wives/girlfriends of patched members).   After approximately 30 minutes, the 7 individuals prepared to depart the BPMC Cleveland clubhouse.   However, at this point, Brown asked CI-1 if the clubhouse had any monies to surrender that would accompany the club's 'books'.   In fact, the club possessed approximately $700 in cash but CI-1 refused to surrender the cash to the 7 individuals.   At this point, the 7 individuals departed the area.   Shortly

thereafter, CI-1 and Verrill exchanged information regarding what King had told CI-1 and Verrill while inside the bathroom. Both CI-1 and Verrill's account matched. After approximately 24 hours, all remaining individuals inside the BPMC Cleveland clubhouse eventually departed the area, primarily for safety concerns. Also, the regional BPMC party that was planned for that weekend was canceled and the BPMC Cleveland clubhouse remains presently 'closed'.

7.     On July 20, 2012 CI-1 telephonically contacted OMC Silver Region President Larry McDaniel and inquired why McDaniel had ordered that the BPMC Cleveland chapter closed. This telephone call originated at approximately 11:20 A.M. and was consensually recorded. A transcript of the telephone call follows:

1. LM:       HELLO.
2 CI-1:       HEY, MAN.
3.LM:       WHAT'S UP?
4.CI-1:       WHAT'S GOING ON?
5.LM:       WELL, WE HAD INFORMATION GIVE US, GIVEN TO US THAT PRETTY MUCH
             TELLING US TO
6      CLOSE THAT DOWN AND INFORMATION SAYING . . . YOU KNOW ANYBODY NAMED MARK
7      SEWELL? S-E-E-U-A-L.
8. CI-1:       NO, I DON'T. WHO . . .
9 . LM:       HUH?
10.CI-1:       WHO IS THAT?
11.LM:       I HAVE NO IDEA. IT'S SAYING IT, THAT'S A NAME THAT, THAT YOU HAVE
             SOMETHING TO
12      DO WITH THE FEDS AND THAT'S YOUR CONTACT NAME.
13.CI-1:       NO.
14.LM:       UH . . . THEY'VE GOT QUITE A BIT WRITTEN DOWN ON SOMETHING THAT THEY
             BROUGHT
15      TO ME THAT UH, THAT MADE ME, WITH WHAT THEY TOLD ME HAVE TO DO WHAT I DID. I
16      HATED TO FOR SOME OF THE OTHER GUYS THERE THAT THIS DIDN'T SAY ANYTHING
17      ABOUT, BUT I DIDN'T HAVE ANY CHOICE WITH YOU.
18.CI-1:       RIGHT. I JUST DON'T UNDERSTAND, I MEAN, MACK, YOU KNOW ME BETTER THAN
             THAT.
19      I WOULD HOPE. BUT I GET IT IF SOMEBODY'S PUT IT OUT UNTIL I CAN PROVE IT
20      DIFFERENT OR WHATEVER, BUT THAT'S BULLSHIT . . .
21LM:       THAT'S WHAT IT'S ALL OVER. WHAT IT'S ALL ABOUT.
22.CI-1:       I GOTCHA. BUT I'LL CHECK IT OUT. I GOT, I DON'T KNOW WHO THAT IS OR WHERE
             IT
23      CAME FROM. SO . . .
24.LM:       UH, WELL, IT CAME FROM ANOTHER STATE. THE PEOPLE, THEY DON'T EVEN
             KNOW YOU.
25      IT'S JUST INFORMATION THAT THEY RECEIVED FROM INSIDE SOURCES.
26.CI-1:       I DON'T HAVE, I GOT A P.O. (UI) . . . BUT THAT'S IT. AND THAT'S USSERY UP THERE
             IN
27      DAHLONEGA. AND THEY JUST SWITCHED ME OVER TO CARLSON. (UI) I'M A FELON.
28      WITH TONS OF PROBLEMS. (LAUGHS)
29.LM:       YEAH. WELL, ALL I CAN DO IS TAKE MORE TIME TO CHECK IN IT MORE
             THOROUGHLY.
30.      BUT I COULDN'T NOT DO WHAT I WAS TOLD ON THAT. BECAUSE . . .
31.CI-1:       (UI)
32.LM:       YOU KNOW.
33.CI-1:       BUT . . .
34.LM:       IF THEY (UI)

35.CI-1:       BUT LAST NIGHT WHEN THEY SHOWED UP WE WASN'T (UI) AND THEN SEAN TOLD
               US
36    WHAT WAS GOING ON. HE SAID HE DIDN'T KNOW ANYTHING ELSE AND HE SAID TALK TO
37    YOU. PRETTY MUCH. SO I HOPE THAT THAT DIDN'T GO OUT TO EVERYBODY BECAUSE
38    THAT'LL FUCK ME FOREVER (UI) YOU GUYS AND THAT ISN'T WHAT I WANT. AND I'LL, I'LL
39    GET INTO IT TOO. AND IF YOU'LL LOOK INTO IT WE'LL FIGURE IT OUT. BUT THAT'S
40    BULLSHIT.
41.LM:        ALRIGHT. WELL, TELL THE UH, THE OTHER GUYS THAT, YOU KNOW, THAT THAT
              WAS THE
42    ONLY WAY THAT IT COULD BE HANDLED AT THE TIME. AND UH, THAT IF THEY WANT TO
43    COME DOWN I'LL TALK TO 'EM ABOUT WHAT THEY WANT, WHATEVER THEY WANT TO DO.
44.CI-1:       SOUNDS . . .
45.LM:        HUH?
46.CI-1:       THAT SOUNDS GOOD.
47.LM:        I'LL TALK TO YOU LATER . . .
48.CI:        BUT I JUST DON'T . . . THAT'S FUCKED (UI)
49.LM:        LISTEN, I UNDERSTAND THAT. SO . . . AIN'T WHAT I WANTED 'CAUSE I, I WAS VERY
              HAPPY
50    TO HAVE PEOPLE UP THERE. ALRIGHT. I'LL TALK TO YOU LATER. YOU WORK ON IT
51    AND I WILL TOO.
52.CI-1:       ALRIGHT.
53.LM:        ALRIGHT. BYE.
(END)

8.     As indicated in line 6 and line 7 in the above transcript, McDaniel is in possession of your affiant's name. Furthermore, as indicated in paragraph 5, the OMC is in possession of CI-1's real name and the information that he is, in fact, a FBI Informant. It is clear to your affiant that the OMC has shared the identity of CI-1 with McDaniel, as attested in the confrontation that occurred in paragraph 6. Furthermore, it is clear that the OMC has shared with McDaniel the name of your affiant to validate their accusation to McDaniel that "...there is a Fed in the Black Pistons house...". Your affiant's 15 years of FBI investigative experience, which includes having achieved successful prosecutions in 2 public corruption investigations, leads your affiant to affirm that this investigation has a public corruption 'leak' that is relaying sensitive information to the OMC. Furthermore, this 'leak' is obstructing the FBI's formal investigation into the OMC by hindering the ability of CI-1 to safely assist the FBI in the investigation of the OMC and the criminal activities of their members. Your affiant's experience indicates that the name of your affiant, who is also 1 of 2 Contact Agents for the CI and the name of the CI are closely held secrets within the FBI. Only via direct contact with FBI agents or FBI documents can a public corruption 'leak' gain the names of the Contact Agent and/or the CI. While the name of the Contact Agent may occasionally be used in non-sensitive FBI documents, the real name of the CI is closely guarded and can only be accessed by people with direct FBI computer access or direct access/overhear to FBI employees. All of the facts listed in this paragraph serve to strengthen your affiant's allegation that there is a public corruption 'leak' that is effectively obstructing this investigation.

9.     On July 22, 2012 CI-1 spoke telephonically with former BPMC member and OMC associate Tony Parrott. This conversation was recorded. During this conversation, Parrott stated that he had recently spoken with an unnamed Florida OMC member and an unnamed Florida BPMC member. According to Parrott, both of these individuals told Parrott that the Florida OMC had "... inside sources...' that were the origin of the paperwork and documents that Larry McDaniel possessed. Parrott added that he had been told by OMC members that they had seen

McDaniel in possession of papers and documents that McDaniel was claiming as the papers and documents revealed CI-1's true name and your affiant's true name.

10.    My 15 years of FBI investigative experience has proven that individuals, whether sworn officers or law enforcement employees, are often referred to as 'inside sources', as in line 25 in the above transcript.  Additionally, my experience during the past 2 years while investigating various Outlaw Motorcycle Gangs (OMG) operating in North Georgia, has proven that some law enforcement officials, traditionally sworn and uniformed officers, often maintain close and unprofessional relationships with members of OMGs.  This is an unexplained phenomenon and continually comprises OMG investigations across America.  With the popularity of current television programs that glamorize the OMG culture, the desire for some law enforcement officials to maintain close, unprofessional and sometimes criminal relationships with OMG members will not easily disappear.  As an example, this investigation has previously uncovered 3 law enforcement officials that are maintaining close, unprofessional relationships with subjects of this referenced North Georgia OMG investigation.  It is through these close and unprofessional relationships that OMG members often gain information that is obstructive to FBI investigations and dangerous to the safety of FBI Informants.

11.    The use of public corruption 'leaks' by the OMC and their support clubs is a common tactic.  For example, the Hoodlums Motorcycle Club is an OMC support club that maintains a clubhouse in northern Gwinnett County.  Their club President is Wesley Seymour, a close associate of Larry McDaniel.  In fact, CI-1 conducted a consensually recorded conversation with McDaniel and Seymour in January, 2011 discussing OMC strategy regarding police officers.  However, in October, 2011 CI-1 again met with Seymour and their conversation was recorded.  During this conversation, Seymour stated:

"We ain't a cop club but we have an intelligence pipeline second to none.  A lot of clubs wish they knew what we know.  We have a better pulse on what is happening, than most.  I hate cops.  I can't fucking stand them.  I think they are fucking Gestapo.  But, I will pat them on the ass and rub them on the back to get every bit of intel out of those SOBs that I can....I hate cops but we manipulate the hell out of a lot of 'em....we are Outlaw support and we believe in keeping things the way they are..."  Your affiant is convinced from 15 years of investigative experience that this is an example of the OMC strategy to recruit public corruption 'leaks' that is detailed in the above paragraphs.

12.    The fact that Larry McDaniel, a/k/a Larry Mack, Sean King, and George Brown have advised members of the OMC and BPMC that there is "fed" in the Cleveland Chapter of the BPMC, that CI-1 is cooperating with law enforcement, and that Larry McDaniel is in possession of papers that establish that CI-1 is an FBI informant effectively and prematurely ended the FBI undercover investigation at the time that your affiant learned that members and leaders of the OMC and BPMC were aware that CI-1 was an FBI informant. At that time your affiant and the UCE had planned to continue the undercover investigation for at least one more month during which the UCE and CI-1 would have continued to record conversations with subjects of the investigation regarding drug transactions, illegal possession of firearms, and illegal making of a destructive device. Because of the actions of Larry McDaniel, a/k/a Larry Mack, Sean King, and George Brown the FBI relocated CI-1 and his family to another state and terminated any further undercover work on CI-1's part. Further, because the UCE had been introduced into the

motorcycle club community by CI-1, the FBI determined that the UCE could no longer safely conduct undercover investigation utilizing the UCE in North Georgia. Therefore, the UCE was no longer able to come to North Georgia and engage targets of the investigation in recorded conversations in furtherance of the investigation. As an example of how the actions of the defendants obstructed the investigaion, prior to learning that the defendants herein were advising other members of the OMC and BPMS that CI-1 was an informant, the UCE had planned to engage targets of the investigation who had already sold the UCE more than a pound of methamphetamine in discussions that the UCE expected would lead to the delivery of 5 pounds of methamphetamine. However, because the UCE's active undercover role in north Georgia was terminated, this investigation was not pursued.